Steven D. COMPTON, Plaintiff–Appellee,

v.

SUBARU OF AMERICA, INC.;
Fuji Heavy Industries, Inc.,
Defendants–Appellants.

Product Liability Advisory Council,
Inc., Amicus Curiae.

No. 94–3429.

United States Court of Appeals,
Tenth Circuit.

April 30, 1996.

Richard C. Hite (Scott J. Gunderson with him on the briefs), Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kansas, for Defendants–Appellants.

Lynn R. Johnson (Stephen N. Six and Patrick A. Hamilton with him on the brief), Shamberg, Johnson & Bergman, Chtd., Overland Park, Kansas, for Plaintiff–Appellee.

Marc R. Brosseau and Scott D. Peterson, Weller Friedrich, LLC, Denver, Colorado, and Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, Virginia, for Amicus Curiae.

Before PORFILIO, McWILLIAMS, and ALARCON, * Circuit Judges.

JOHN C. PORFILIO, Circuit Judge.

Steven D. Compton brought this products liability action after sustaining severe injuries in an automobile rollover accident. Mr. Compton sued the automobile manufacturer, Fuji Heavy Industries, Ltd. (Fuji), and the distributor, Subaru of America, Inc. (Subaru), alleging the accident vehicle was defectively designed. After a jury trial, Subaru and Fuji were found 56% at fault for Mr. Compton's injuries, and judgment was entered against them in the amount of $6,574,-081.

On appeal, Subaru and Fuji raise two issues. First, they contend the district court erroneously admitted the testimony of Mr. Compton's design expert and thus failed to carry out its gatekeeping function as required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct.

* The Honorable Arthur L. Alarcon, Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

2786, 125 L.Ed.2d 469 (1993).[1] Second, Subaru and Fuji argue the district court improperly denied their renewed motion for judgment as a matter of law. We affirm.

I.

On the evening of February 19, 1988, Mr. Compton and four other teenaged friends consumed several six-packs of beer and drove around Scott County, Kansas, in a 1982 Subaru GL Station Wagon. While traveling on U.S. Highway 83, the teenagers spotted the automobile of Mr. Compton's ex-girl-friend. Tailing behind, the Subaru weaved back and forth across the yellow line until one of the teenagers reached over and yanked on the steering wheel, causing the driver to lose control. The Subaru skidded across the highway, entered a ditch, and rolled over twice. During its first roll, Mr. Compton, seated in the rear seat behind the driver and not wearing a seatbelt, suffered a spinal cord injury resulting in quadriplegia.

Mr. Compton filed this action against Subaru and Fuji in February 1990. In his complaint, Mr. Compton alleged the accident vehicle was defectively designed because there was "excessive and extensive intrusion of the roof and side of the automobile into the passenger compartment during the roll-over." According to Mr. Compton, he would have avoided serious injury during the roll-over if the roof had not "collapsed inward" onto his head. Therefore, Mr. Compton asserted Subaru and Fuji were strictly liable for his injuries.

During trial, Subaru and Fuji objected to the proposed testimony of Mr. Compton's sole design expert, Larry Bihlmeyer, because they contended Mr. Bihlmeyer's background and experience did not qualify him as an expert on the design of automobile roofs or roof support structures. Furthermore, Subaru and Fuji urged Mr. Bihlmeyer failed to meet the requirements for expert testimony set out in *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. After a Rule 104(a) hearing conducted outside the presence of the jury, however, the district court ultimately concluded Mr. Bihlmeyer was sufficiently qualified and allowed him to testify.

Having survived the district court's initial scrutiny of his qualifications, Mr. Bihlmeyer, an aerospace and mechanical engineer, testified the design and roof support structures in the accident vehicle were defective because they permitted excessive roof crush. He then pinpointed areas of the roof structure where, in his expert opinion, additional support was required. To correct the alleged defects, Mr. Bihlmeyer testified he would design the vehicle to allow only 2 to 3 inches of roof crush. He also explained crush should be limited to ensure 33 inches of remaining headroom after an accident occurring at a speed of 50 m.p.h. Under this standard, the roof of the vehicle would be required to sustain average forces of between 48,000 and 71,000 pounds, which the district court remarked "seems more applicable to a Sherman tank than to any vehicle which the ordinary consumer would drive."

In arriving at his conclusion that the accident vehicle was defectively designed, Mr. Bihlmeyer relied upon his inspection of the accident vehicle and an identical, undamaged 1982 GL Subaru Station Wagon. Next, Mr. Bihlmeyer established his proposed roof crush and headroom requirements by comparing the headroom measurements in the accident vehicle with measurements compiled from hundreds of other accident vehicles he had examined during his eight-year career as a "consulting engineer." Mr. Bihlmeyer also used six other sources to support his proposed requirements: (1) a summary of a 1972 proposed, but not adopted, Ford Motor Company (Ford) standard which would have required a remaining headroom of 29.4 inches after roof crush on unnamed vehicles; (2) technical papers containing information about a Ford experimental safety vehicle which was not a production vehicle; (3) a 1966 proposed, but not adopted, federal standard for light utility vehicles with open bodies which would have required roll bars and a minimum of 33 inches remaining headroom

---

1. The Product Liability Advisory Council, Inc., filed an amicus brief in support of Subaru and Fuji urging us to apply *Daubert* to all expert testimony. However, as discussed below, we expressly decline to reach this issue.

after roof crush; (4) a Society of Automotive Engineers (SAE) paper presented by an engineer at Fiat, discussing the advantages of roof crush as an energy-absorbing device for seat-belted occupants; (5) Federal Motor Vehicle Safety Standard 216, which sets no requirements for remaining headroom after roof crush; and,(6) an SAE paper entitled "Field Studies of Rollover Performance," which studied rollover accidents involving British cars and light vans, but did not propose any headroom requirements.

At the close of Mr. Compton's case, and again at the close of all the evidence, Subaru and Fuji moved for judgment pursuant to Fed.R.Civ.P. 50(a), arguing Mr. Bihlmeyer's testimony was so ludicrous no reasonable juror could conclude his testimony was more likely than not true. In both instances, the district court denied the motions after carefully examining Mr. Bihlmeyer's testimony. Subsequently, the jury returned a verdict finding Subaru and Fuji 56% at fault for Mr. Compton's injuries. After the verdict, Subaru and Fuji renewed their Rule 50 motion, which the district court denied. Subaru and Fuji now appeal.

## II.

Upon Subaru's and Fuji's motion, the district court heard argument regarding the admissibility of Mr. Bihlmeyer's testimony. Although expressing doubts about his credibility, the court ultimately determined Mr. Bihlmeyer met the qualifications for expert testimony under Federal Rule of Evidence 702. The district court addressed *Daubert's* applicability and explained:

I don't think the *Daubert* case has a lot to do with the problem that I'm faced with.... I don't think we're dealing with [a *Daubert* situation] here. Really. But to the extent that you might say that we are, clearly there's some scientific knowledge involved in the testimony of Mr. Bihlmeyer and it seems to me that ... his testimony ... is being offered and will assist the jurors to understand whether or not there is a design or manufacturing defect involved in this case. So to the extent the *Daubert* case is applicable, it's applicable.

Thus, the district court relied, in part, on *Daubert* in reaching its conclusion Mr. Bihlmeyer was qualified as an expert.

Subaru and Fuji now contend the district court erred in admitting Mr. Bihlmeyer's testimony. Under *Daubert's* test for the admissibility of scientific evidence, Subaru and Fuji argue Mr. Bihlmeyer's testimony should have been excluded because it lacked evidentiary reliability and was not grounded in any particular reasoning or methodology. They contend Mr. Bihlmeyer's testimony was nothing more than his personal opinion the roof of the accident vehicle was not sufficiently resistant to crush. Indeed, Subaru and Fuji assert Mr. Bihlmeyer did not rely on industry data and did not refer to any scientific principles or knowledge supporting his personal standard for roof crush resistance. Accordingly, because there was no peer review, no testing, and no evidence of general acceptance of Mr. Bihlmeyer's theory, Subaru and Fuji argue Mr. Bihlmeyer's testimony should have been excluded under *Daubert.*

In response, Mr. Compton contends *Daubert* is inapplicable to Mr. Bihlmeyer's nonscientific testimony. Mr. Compton asserts Mr. Bihlmeyer reached his conclusions based upon his own expertise and experience, not the methods and procedures of science. Therefore, Mr. Compton argues the district court correctly stated "[f]actors such as rate of error, peer review and acceptance in a 'relevant scientific discipline' have little, if any, bearing on mundane, 'professional witness' engineering testimony such as [Mr.] Bihlmeyer's." *Daubert* aside, Mr. Compton contends the district court did not err in admitting Mr. Bihlmeyer's testimony.

■ The applicability of *Daubert* is a question of law which this court reviews *de novo*. See, e.g., *Bradley v. Brown*, 42 F.3d 434, 436 (7th Cir.1994) ("we undertake a de novo review of whether the district court properly followed the framework set forth in *Daubert* "). However, once we determine *Daubert's* relevance and application, our review of the district court's decision to admit expert testimony is limited. We may reverse the district court only for abuse of discretion.

*United States v. Barbee,* 968 F.2d 1026, 1031 (10th Cir.1992).

We begin our analysis with a discussion of *Daubert's* impact on the law governing the admissibility of expert opinion testimony in a federal trial. Rule 702, which regulates the admission of expert testimony, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

Prior to *Daubert,* we recognized, under the Federal Rules, trial courts "are accorded broad discretion in determining the competency of expert witnesses." *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir. 1991). Our cases further noted, however, the trial court "may not employ [this] discretion to restrict viable and relevant theories offered by a party." *Graham v. Wyeth Labs.,* 906 F.2d 1399, 1409 (10th Cir.), *cert. denied,* 498 U.S. 981, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990). Instead, mindful of the " 'liberal thrust' of the Federal Rules," *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988), we have instructed, "the 'touchstone' of admissibility [under Rule 702] is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.,* 950 F.2d 643, 648 (10th Cir.1991). Therefore, "as long as a logical basis exists for an expert's opinion ... the weaknesses in the underpinnings of the opinion[ ] go to the weight and not the admissibility of the testimony." *Jones v. Otis Elevator Co.,* 861 F.2d 655, 663 (11th Cir.1988); *see also, Orth v. Emerson Elec. Co., White-Rodgers Div.,* 980 F.2d 632, 637 (10th Cir.1992).

The Supreme Court's decision in *Daubert* now mandates a further Rule 702 inquiry under certain circumstances. In *Daubert,* the Court considered the admissibility of novel scientific evidence. There, petitioners brought suit against Merrell Dow for birth defects allegedly caused by ingestion of the drug Bendectin during pregnancy. *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Petitioners sought to introduce the tes-timony of several experts who relied upon animal rather than epidemiological (human statistical) studies in reaching their conclusion that Bendectin caused birth defects. Because petitioners' experts did not base their testimony on epidemiological evidence, the district court held the expert testimony failed to meet the "general acceptance" test as set out in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), 727 F.Supp. 570, 575 (S.D.Cal.1989). On appeal, the Ninth Circuit affirmed. 951 F.2d 1128 (1991).

■ After granting certiorari, the Supreme Court reversed. Rejecting the *Frye* test, the Court set out a new framework for determining the admissibility of expert scientific testimony:

> [T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796. The Court then outlined a nonexhaustive list of factors courts should consider when reviewing a proffer of expert scientific testimony. These include whether the theory or technique has been tested, subjected to peer review or publication, is generally accepted within the relevant scientific community, or has a known or potential rate of error. *Id.* at 591–95, 113 S.Ct. at 2796–97. In considering these factors, the Court reminded, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. at 2797.

■ The language in *Daubert* makes clear the factors outlined by the Court are applicable only when a proffered expert relies on some principle or methodology. In other words, application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training. *See, e.g., United States v. Rice,* 52 F.3d

843, 847 (10th Cir.1995) (citing *Daubert* but applying a traditional Rule 702 analysis to tax attorney's expert testimony which was based upon his personal experiences). In such cases, Rule 702 merely requires the trial court to make a preliminary finding that proffered expert testimony is both relevant and reliable while taking into account "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 589–95, 113 S.Ct. at 2795–97.

Subsequent to *Daubert*, we have continued to apply essentially the same Rule 702 analysis except in cases involving unique, untested, or controversial methodologies or techniques. In *United States v. Markum*, 4 F.3d 891 (10th Cir.1993), for example, we cited *Daubert's* analysis of Rule 702 in upholding the district court's decision to permit a fire chief's testimony based upon personal observations and the observations of fellow firefighters. There, because no methodology or technique was implicated, we applied a traditional Rule 702 analysis. *Id.* at 895–96. Similarly, in *United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994), we again resorted to the conventional Rule 702 approach, permitting expert testimony by a police officer with specialized knowledge of drug trafficking. However, in *Muldrow*, we also applied the *Daubert* factors to the expert testimony of a forensic chemist to determine the reliability and relevance of his methodology. *Id.* at 1337.

■ In sum, we do not believe *Daubert* completely changes our traditional analysis under Rule 702. Instead, *Daubert* sets out additional factors the trial court should consider under Rule 702 if an expert witness offers testimony based upon a particular methodology or technique.

■ With this background in mind, we turn to the specific facts before us. We conclude, for reasons other than those urged by Mr. Compton, the district court erred in its application of *Daubert* in this case.[2] Mr. Compton characterizes Mr. Bihlmeyer's testimony as nonscientific evidence and argues *Daubert* is inapplicable to such evidence. However, it is unnecessary to reach the question whether *Daubert* mandates a further inquiry into Mr. Bihlmeyer's "scientific, technical, or other specialized knowledge" under Rule 702 because we find his testimony was not based on any particular methodology or technique. Rather, Mr. Bihlmeyer reached his expert conclusions by drawing upon general engineering principles and his twenty-two years of experience as an automotive engineer. Absent some particular methodology or technique, *Daubert* simply has little bearing on Mr. Bihlmeyer's testimony.

■ Although the district court erred in applying *Daubert*, we nevertheless affirm the court's decision to permit Mr. Bihlmeyer's testimony because we are convinced the court fulfilled its responsibility under Rule 702.[3] The district court, after carefully reviewing Mr. Bihlmeyer's testimony, reluctantly concluded his testimony was "facially helpful and relevant." Moreover, citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.1991), the court found Mr. Bihlmeyer "possessed the basic qualifications to give such testimony."

Subaru and Fuji argue Mr. Bihlmeyer was not qualified to give expert testimony under Rule 702 because he lacked experience designing car roofs or supporting structures. We disagree. The record reveals Mr. Bihlmeyer is an aerospace and mechanical engineer with twenty-two years of experience in automotive engineering. During his fourteen years at Ford, Mr. Bihlmeyer spent nine years in the vehicle components engineering

---

**2.** "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *United States Nat'l Bank v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 446, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991)).

**3.** "We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval*, 29 F.3d 537, 542 n. 6 (10th Cir.1994) (quotations omitted).

division and five years in vehicle engineering where he was involved in the development of the Ranger Supercab pick-up truck roof design. Although Mr. Bihlmeyer never conducted or observed rollover tests or static tests for roof crush while at Ford, in the eight years since leaving Ford to become a "consulting engineer," Mr. Bihlmeyer has performed numerous design analyses on the roof and roof support structures of various vehicles.

■ As long as an expert stays "within the reasonable confines of his subject area," our case law establishes "a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Wheeler,* 935 F.2d at 1100 (mechanical engineer with expertise in the design of farm equipment permitted to testify on consumer expectations despite lack of experience in consumer sampling); *see also, Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 176–77 (5th Cir.1990) (engineer experienced in designing devices similar to a brake press qualified to testify on safety of brake press), *cert. denied,* —— U.S. ——, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993). In this case, Mr. Bihlmeyer based his testimony upon general engineering principles and concepts. Although another witness might certainly have provided greater expertise in the area of roof design and support structures, nevertheless, we think Mr. Bihlmeyer's education and experience as an automotive engineer were sufficient to permit his testimony. Thus, we hold the district court did not abuse its discretion.

### III.

■ Next, Subaru and Fuji argue the district court erred in denying their renewed motion for judgment as a matter of law made pursuant to Fed.R.Civ.P. 50(b). We review the district court's denial of a Rule 50(b) motion *de novo, Sheets v. Salt Lake County,* 45 F.3d 1383, 1387 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995), applying the same standard used by the district court. *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 723 (10th Cir.1993). "Under this standard, we may find error only if the evidence points but one way and is susceptible to no reasonable infer-

ences supporting the party for whom the jury found; we must construe the evidence and inferences most favorably to the non-moving party." *Zimmerman v. First Fed. Sav. & Loan Ass'n of Rapid City,* 848 F.2d 1047, 1051 (10th Cir.1988).

■ Subaru and Fuji argue, first, the district court was "dutybound" to grant the Rule 50(b) motion in light of the court's serious reservations about the testimony of Mr. Compton's sole design expert, Mr. Bihlmeyer. We disagree. In its Memorandum and Order denying the Rule 50(b) motion, the district court commented, "[r]ereading Bihlmeyer's testimony has done nothing to change the court's extremely low opinion of Bihlmeyer's credibility and of the validity of his opinions." The court then correctly noted the weight and credibility of Mr. Bihlmeyer's testimony were issues for the jury, and concluded his testimony met the requirements under Rule 702. This finding was critical to the court's acceptance of Mr. Bihlmeyer's testimony. Having made its Rule 702 determination, the district court did not err in allowing Mr. Bihlmeyer's testimony despite the court's opinion of his testimony.

■ Second, Subaru and Fuji contend Mr. Bihlmeyer's testimony is insufficient under Kansas law because it amounted to a conclusory allegation the roof of the Subaru was too weak. To prove defective design under Kansas law, a plaintiff must do more than merely assert a different design was feasible. *Garst v. General Motors Corp.,* 207 Kan. 2, 20, 484 P.2d 47, 61 (1971); *see also, Meyerhoff v. Michelin Tire Corp.,* 852 F.Supp. 933, 947 (D.Kan.1994), *aff'd,* 70 F.3d 1175 (10th Cir.1995). However, after reviewing the record, we conclude Mr. Bihlmeyer identified at least six specific design defects and adequately supported his conclusions.

Finally, Subaru and Fuji assert Mr. Bihlmeyer's testimony was insufficient to rebut the presumption of nondefectiveness under the Kansas Product Liability Act (KPLA). Under KPLA:

When the injury-causing aspect of the product was, at the time of manufacture, in compliance with legislative regulatory standards or administrative regulatory

safety standards relating to design or performance, the product shall be deemed not defective by reason of design or performance, ... unless the claimant proves by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions.

Kan. Stat. Ann. § 60–3304(a). Subaru and Fuji argue their Rule 50(b) motion should have been granted because Mr. Compton provided no evidence the alleged regulatory standard, Federal Motor Vehicle Safety Standard (FMVSS) 216, 49 C.F.R. § 571.216, was inadequate or that additional precautions were necessary.

However, in this case, the parties contested the applicability of FMVSS 216, which "establishes strength requirements for the passenger compartment roof." 49 C.F.R. § 571.216. The district court found FMVSS 216 applied solely to the front pillars on either side of the windshield, known as the A pillars. Because Mr. Compton's injury occurred when the roof support pillars behind the rear doors (the C pillars) and the pillars behind the cargo deck (the D pillars) collapsed, the district court concluded Kan. Stat. Ann. § 60–3304(a) was inapplicable.

We review *de novo* the district court's interpretation of federal regulations. *Dodson v. Zelez*, 917 F.2d 1250, 1255 (10th Cir.1990). We have found few cases applying FMVSS 216 and none interpreting its scope. However, after reviewing the regulation, we are not convinced the district court's interpretation of FMVSS 216 was unreasonable. FMVSS 216's roof crush resistance tests for passenger cars require the application of force to "either side of the forward edge of a vehicle's roof." 49 C.F.R. § 571.216. Moreover, the regulation mandates "[b]oth the left and right front portions of the vehicle's roof structure shall be capable of meeting the requirements." *Id.* In view of FMVSS 216's emphasis on the A pillars, we cannot hold it explicitly applies to C or D pillar crush. Accordingly, because there appears to be no applicable regulation governing rear seat roof crush, we agree Kan. Stat. Ann. § 60–3304(a) has no application on these special facts.

Drawing all reasonable inferences in favor of Mr. Compton, we hold the district court did not err in denying the Rule 50(b) motion. The judgment of the district court is **AFFIRMED.**